**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:22-CR-00237-6 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CANDELARIO ZAVALA | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court is a motion to suppress evidence filed by Defendant

Candelario Zavala ("Zavala").  (Doc. 84.)  Zavala seeks to suppress evidence

recovered from a car battery which law enforcement retained for disposal after

rendering it inoperable during a search pursuant to a warrant and conducted with

Zavala's consent.  After retaining the inoperable battery, law enforcement received

additional information which suggested the inoperable battery might contain

contraband.  They then dismantled the battery and found twelve bricks of

suspected heroin inside.

Following review of the arguments and evidence submitted, the court

concludes that law enforcement failed to provide notice to Zavala that they had

retained his battery.  In doing so, they deprived Zavala of the opportunity to revoke

his consent and therefore violated his Fourth Amendment rights.  But the court

further finds that law enforcement acted in good faith, so the exclusionary rule

does not apply.  For these reasons, the court will deny the motion to suppress the evidence recovered from the car battery.

## PROCEDURAL HISTORY

On June 22, 2022, a five-count indictment was returned against Zavala and five co-defendants.  (Doc. 1.)  Zavala is only charged in Count I with conspiracy to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846.  (*Id*.)

On June 24, 2022, Zavala entered a not guilty plea.  (Doc. 30.) Independently and with his co-defendants Zavala filed multiple motions to continue pretrial deadlines, which the court granted.  (Docs. 69, 73, 75, 83, 87, 96, 114.)  On June 15, 2023, Zavala filed the instant motion to suppress evidence as well as a brief in support.  (Docs. 84, 85.)  At Zavala's request, the court continued the evidentiary hearing, which it ultimately held on September 21, 2023.  (Docs. 92, 100.)  The Government filed a brief in opposition to Zavala's motion on November 3, 2023.  (Doc. 110.)  Zavala filed a reply brief on November 17, 2023. (Doc. 112.)

**FACTUAL FINDINGS**[1]

On November 3, 2021, Special Agent Jonathan Wilson ("Agent Wilson") for Homeland Security Investigations ("HSI") in the Department for Homeland Security ("DHS") received information related to a drug trafficking investigation. (Doc. 105, pp. 5–7.)[2]  Agent Wilson was told that a vehicle associated with Zavala had been seen in Lenoir City, Tennessee.  (*Id.* at 6–7.)  Agent Wilson's office found the vehicle at a Walmart.  (*Id.* at 7.)  Zavala exited the Walmart, entered a gray Chevrolet Equinox (the "vehicle"), and drove off of the premises.  (*Id.*)  Interdiction troopers from the Tennessee Highway Patrol ("THP") conducted a traffic stop of Zavala's vehicle.  (*Id.*)  The troopers determined that Zavala's license was suspended.  (*Id.*)

THP brough a K-9 unit to the traffic stop.  According to a November 3, 2021, affidavit, the K-9 displayed behavior indicating the presence of narcotics in the vehicle.  (Gov't Ex. 1.)  During the course of the stop, officers noticed that the vehicle contained two car batteries.  The main battery was in the engine compartment connected to the vehicle.  There was also a second battery in the rear of the vehicle on the floor behind the driver's seat.  (*Id.* at 8.)

---

[1] The factual findings are taken from the parties' briefs on the motion to suppress as well as the facts the court credits upon consideration of the evidence presented during the evidentiary hearing on September 21, 2023.  (Docs. 85, 110, 112.)

[2] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

At the conclusion of the traffic stop, Zavala's vehicle was transported to a garage controlled by the Lenoir City Tennessee Police Department.  (Doc. 105, p. 7.)  Agent Brendan DeBoer ("Agent DeBoer"), a task force supervisor for the HSI, submitted a sworn affidavit in support of a search warrant.  (Gov't Ex. 1; Doc. 105, p. 58.)  A search warrant was issued (the "first warrant") on November 3, 2021.  (*Id.*)  While executing the first warrant, law enforcement detached and removed the main battery.  (Doc. 105, p. 8.)  The interdiction troopers assisted HSI agents in executing the first warrant.  (*Id.*)  The interdiction troopers probed the battery, attempting to determine its contents and any irregularities.  (*Id.* at 8–9, 21.) In the course of that probe, a large amount of battery acid spilled out of the battery. (*Id.* at 9.)

The acid got on the trooper probing the battery, the table, the floor of the garage, and the battery itself. (Gov't Ex. 9; Doc. 105, p. 61–62.)  Believing that this loss of battery acid had rendered the battery inoperable, law enforcement did not return the battery to the engine compartment.  (Doc. 105, pp. 72–73.)  Instead, believing that the battery contained no contraband, law enforcement set it aside. Agent DeBoer testified that they placed it in an empty garbage can to contain the leaking battery acid.  (*Id.* at 71–72.)  The battery was kept there until law enforcement could properly dispose of the item covered in and consisting of hazardous material.  (*Id.* at 72–73.)  Agent Wilson testified that law enforcement

4

only retained the battery because he "knew we couldn't just throw it away . . . there's regulations about batteries and hazmat." (*Id.* at 47.)

In order to return the vehicle to Zavala in operable condition, law enforcement connected the second battery to the car but were unsuccessful in starting the vehicle. (*Id.* at 62.) Agent Wilson sent an officer to an automotive store to buy a replacement battery, which they installed in the vehicle. (*Id.*) The return for the first search warrant, dated November 4, 2021, listed the property seized. (Doc. 85-3.) The only item listed was a red Motorola cell phone. (*Id.*)

On the following day, November 4, 2022, Agent Wilson visited Zavala where he was being held, in the Loudon County Justice Center, and obtained Zavala's written consent to search the vehicle. (*Id.* at 10; Gov't Ex. 2.) Zavala gave his consent via two forms, identical except with respect to the property to which they referred. One referred to an Android phone. (Gov't Ex. 2, p. 2.) The other referred to the vehicle. (*Id.* at 3.) The forms were in Spanish. Citing the form that Zavala signed, and quoting from its English equivalent, the Government represents that the consent form authorized "investigators to 'take any letters, papers . . . or other property which they may desire to examine.'" (Doc. 110, p. 8 (citing Gov't Ex. 2, p. 3; Doc. 110-2).)

On November 5, 2022, Agent DeBoer sought and received another warrant (the "second warrant") to search Zavala's vehicle. (Docs. 85-4, 85-5.) Agent

Wilson testified that they obtained the second warrant, despite already having Zavala's written consent, because of the specific search tactics they intended to use.  Specifically, their search for a secret compartment or trap in the vehicle would be especially invasive and require dismantling parts of the vehicle.  (Doc. 105, pp. 41, 54.)  Given the nature of the tactics used, Agent Wilson was concerned that the search might damage the vehicle.  (*Id.* at 53–56.)  Like the prior searches, this second search resulted in nothing of evidentiary value.  (*Id.* at 18–19.)

The return for this second warrant, as with the prior one, provides a space to document what property was seized pursuant to the warrant.  (Doc. 85-5.)  In the case of the return for the second warrant, the list includes notations that appear to have been made at two different times or with two different writing implements. The first, in light gray color, reads "no items seized" and includes the words "cell phone" struck through.  (*Id.*) These marks match that of Agent DeBoer's signature and the date November 5, 2024.  (*Id.*) Second, in darker print but apparently the same handwriting, is the following text: "Note – vehicle battery retained @ 9th JDTF office, agents made it inoperable during search. Replaced with new battery, purchased by 9th JDTF."[3]  (*Id.*)  It is followed by the word "battery," which is

_____

[3] 9th JDTF is a reference to the Ninth Judicial Drug Task Force.  (Doc. 105, p. 59.)  The HSI office where DeBoer works is attached to the 9th JDTF.  (*Id.*)

struck through.  (*Id.*)  The darker markings are not dated, but Agent DeBoer

testified that they were added on either November 5 or 6, 2021.  (Doc. 105, p. 83.)

After the conclusion of the search pursuant to the second warrant, the

vehicle was released from police custody.  (*Id.* at 21.)  Agent DeBoer testified that

he believed, but could not be sure, that he added his note on the second warrant

return prior to the vehicle being returned to Zavala.  (*Id.* at 80–81, 83–84.)  He also

testified that it was generally the procedure to leave a copy of the warrant return in

the vehicle or in the bin of personal possessions of a person if they remained in

custody during the search.  (Doc. 105, p. 78.)  But he could not testify with

personal knowledge that a copy of the return was provided to Zavala via either

method.[4]  (*Id.*)

Agent DeBoer left Lenoir City for training on November 7, 2021, and was

away until November 13, 2021.  (Doc. 105, p. 82.)  Meanwhile, on November 9,

2021, Agent Wilson received information from a confidential source that Zavala's

codefendant Nicanor Zavala ("Nicanor") had come to Lenoir City.  (*Id.* at 22.)

During recorded conversations, Nicanor referenced a battery in a way that

suggested it was of value.  (*Id.*)

---

[4] Agent Wilson testified to the same general practices but likewise could not testify with
certainty that Zavala had been provided a copy of the return of the second warrant.  (Doc. 105,
pp. 25, 39, 50.)

Agent Wilson then realized that the seemingly useless battery awaiting disposal might contain contraband after all.  (*Id.* at 22–23.)  Agent Wilson conferred with Agent DeBoer about how to access the building where the battery was stored. (*Id.* at 64.)  Pursuant to Agent DeBoer's advice, Agent Wilson checked with Don Elswick ("Elswick") in the HSI Knoxville office and asked him to verify that the battery was still in the garage.  (*Id.* at 23, 64.)  Agent DeBoer asked Agent Wilson whether a search warrant was required, and Agent Wilson responded that he would call Agent DeBoer back after checking with an Assistant United States Attorney.  (*Id.* at 24, 64.)  Agent DeBoer testified that he was prepared to obtain another state search warrant, if necessary, as were his colleagues.  (*Id.* at 64–65.)

After conferring with an Assistant United States Attorney, Agent Wilson determined that a search warrant was not required to dismantle the battery.  They decided that the consent form which Zavala had signed gave them sufficient authorization to dismantle and search the battery.  (*Id.* at 52–54.)  Agent Wilson notified Agent DeBoer that, in light of Zavala's written consent, which had not been revoked, no search warrant was necessary.  (*Id.* at 65.)

Agent Wilson then instructed Elswick to secure the battery.  (*Id.* at 88.)  An agent from the Environmental Protection Agency was on the scene.  (*Id.* at 89.)  After trying to dismantle the battery with various tools, Elswick ultimately broke it

apart with a sledgehammer.  (*Id.* at 89–90.)  Inside were twelve bricks of suspected narcotics.  (*Id.* at 90–91.)

On November 15, 2021, the return for the second warrant was returned to the court and filed.  (Doc. 85-4; Doc. 105, p. 77.)  On December 8, 2021, law enforcement interviewed Zavala and discussed with him the contents of the battery.  (Doc. 105, pp. 28–29.)  During that interview, Agent DeBoer provided a property receipt to Zavala for a car battery from a Chevrolet Equinox.  (Gov't Ex. 5, p. 2; Doc. 105, p. 29.)

## DISCUSSION

Zavala argues that the evidence should be suppressed for three reasons. First, law enforcement unreasonably took and searched the battery without a warrant in violation of the Fourth Amendment.  (Doc. 85, p. 2.)  Second, law enforcement indefinitely seized the battery without a valid investigatory purpose or notice in violation of the Fourth Amendment.  (*Id.*)  And third, law enforcement indefinitely retained the battery, absent a legitimate government interest, in violation of Zavala's right to due process. (*Id.*)  The Government responds that law enforcement acted pursuant to Zavala's consent when it retained and searched the battery, that retention and search did not violate due process, and the exclusionary rule is not warranted.  (Doc. 110, pp. 6–14.)  The court will address these arguments below.

### A. Consent

The United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  When a "search [is] conducted without a warrant issued upon probable cause," it is generally "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citations omitted).  One such exception is when a warrantless search is conducted pursuant to consent.  *Id.*  When a search is justified by consent, the government bears the burden of "proving that the consent was, in fact, freely and voluntarily given."  *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)).

Here, the issue does not revolve around whether Zavala initially gave free and voluntary consent.  That is not contested.  Instead, the court must address whether the ultimate search of the battery was within the scope of that consent and whether Zavala was provided notice sufficient to revoke his consent.

Under Third Circuit and Supreme Court precedent, "a consensual search satisfies the mandates of the constitution only if conducted within the boundaries of the consent given."  *United States v. Williams*, 898 F.3d 323, 330 (3d Cir. 2018) (citing *Walter v. United States*, 447 U.S. 649, 656 (1980)).  The yardstick for

measuring the "scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (cleaned up).

Regarding this first question, the court finds that Zavala's consent extended to law enforcement removing, probing, and retaining the battery. The form Zavala signed allowed law enforcement to search the vehicle and take property contained therein which they wished to examine. The battery was property contained in the vehicle. Therefore, a typical reasonable person in Zavala's position would understand that the consent extended to the battery, which law enforcement removed from the vehicle to examine for contraband.

To be clear, Zavala argues that his consent did <u>not</u> extend to the battery. (Doc. 112, p. 6–9.) He correctly asserts that the consent form related to property inside the vehicle. He further argues that, unbeknownst to him, the battery had already been removed. (Doc. 112, pp. 6–9.) Therefore, it could not be included in his consent to search and seize property in the vehicle.

The facts cut against Zavala on this point. He has taken the position that he was unaware that the battery had already been removed from the vehicle when he consented to the search of the vehicle. Likewise, a reasonable person in his situation would not have known the battery had already been removed. Therefore,

a reasonable person's consent would reasonably extend to the battery, which would reasonably be believed to be inside the vehicle.

The court concludes that the removal, initial search, and retention of the battery were within the scope of Zavala's consent. But then, law enforcement returned the vehicle to Zavala on November 5, 2021, with a replacement battery and did not inform him that his original battery was retained. And so, Zavala argues that, by retaining the battery without providing him notice, law enforcement deprived him of his constitutional right to revoke consent. (*Id.* at 8.) This argument rests on a limit to consensual searches. That is, a suspect retains the ability to revoke or narrow their consent even after giving it: "That a party may terminate a search by withdrawing his consent is a corollary of the recognition that the subject of a consensual search determines the parameters of that search." *Williams*, 898 F.3d at 330.

Here, the Government has not shown that law enforcement notified Zavala that they had retained the battery when they released the vehicle to him. Agents Wilson and DeBoer testified that they could not be sure that Zavala was provided a copy of the return of the second search warrant when the vehicle was released to him on November 5 or 6, 2021. (Doc. 105, pp. 25, 39, 50, 75–76, 78.) And Agent DeBoer could not be sure that the return was amended prior to the vehicle's release to include the notation that the battery was retained. (*Id.* at 75–76.) Thus, Zavala

may have remained unaware that law enforcement retained the battery until December 8, 2021, when Agent DeBoer provided him the property receipt noting that law enforcement had retained the battery.  (Doc. 105, p. 46.)  And that is important.  Because, by failing to provide such notice to Zavala, law enforcement rendered him unable to narrow or withdraw his consent.

The failure to prove that Zavala was notified that the battery was retained leads to the conclusion that the ultimate search of the battery was objectively unreasonable because Zavala had no ability to withdraw his consent.  A typical reasonable person in Zavala's situation would have expected to either receive the battery back along with the rest of the vehicle or else be notified of its retention. Indeed, in this case, Zavala received his vehicle back with an operable battery in the engine compartment and the spare battery still in the rear seat.  He had no reason to suspect that law enforcement retained his battery, much less official notice that they did so.  Further, without such notice, a reasonable person would not be able to revoke his consent and thereby recover his property.  Because law enforcement deprived Zavala of notice of the battery retention, based on which he could revoke his consent, the search of the battery was unreasonable and violated the Fourth Amendment.

**B. Indefinite seizure or destruction of property**

Zavala also argues that law enforcement violated his Fourth Amendment rights by indefinitely seizing the battery without his knowledge or consent. (Doc. 85, p. 8.) He argues that any legitimate interest that the Government had in the battery ended when it returned the second search warrant including a note that no items had been seized. (Doc. 85, p. 9.) On the return, law enforcement noted that it had retained the battery because agents had rendered it inoperable. (*Id.*) Because law enforcement no longer considered the battery evidence of wrongdoing, Zavala argues that they had no interest in retaining it. (*Id.*) Instead, they were obligated to return it to Zavala.[5] (*Id.*)

Under Supreme Court precedent, a court "must balance the nature and quality of the intrusion of the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983). Such claims are assessed on a

---

[5] Zavala made this argument in his initial brief prior to the evidentiary hearing. In making this argument, he states that governmental interest in the battery ended when law enforcement returned the second search warrant. But, as addressed in the court's analysis of Zavala's consent above, Zavala does not concede that he ever received the return of the second search warrant. And the warrant was not returned to the court until November 15, 2021, which was after the contraband was discovered. According to Zavala, he first learned that law enforcement had retained the battery on December 8, 2021. (Doc. 112, p. 4.) Zavala's argument is unclear. He describes the return of the second search warrant as an event which extinguished the governmental interest in the battery. But according to Zavala, that event either never occurred or, if defined by law enforcement's delivery of the return to the court, occurred after the recovery of the contraband.

reasonableness standard, which will reflect a "careful balancing of governmental and private interests." *Soldal v. Cook Cty.*, 506 U.S. 56, 71 (1992).

Zavala likens the situation in this case to *Place*. In *Place*, an initially lawful seizure of defendant's luggage became unreasonable and unlawful when extended to ninety minutes. 462 U.S. at 710.

The Government argues that the facts here do not resemble a prolonged seizure. Instead, they represent government destruction of property incidental to a lawful search. (Doc. 110, pp. 8-10.) When the task force probed the battery, it effectively destroyed it. After it was destroyed, the Government argues, law enforcement reasonably treated it as having no legitimate use or value. (*Id.* at 9.) They retained it only incidentally until they could properly dispose of it. (*Id.*)

Under Supreme Court precedent, Government conduct constitutes a seizure of personal property when it creates a "meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). This may include destruction of property. *United States v. Ramirez*, 523 U.S. 65, 71 (1998). And such destruction may violate the Fourth Amendment where it is excessive or unnecessary. *Id.*

The Government argues that law enforcement was not excessive or unnecessary in its treatment of the battery. (Doc. 110, p. 10.) Instead, its initial search methods, although sufficient to render the battery inoperable, were not

15

sufficiently invasive to find the hidden contraband.  (*Id.*)  Nonetheless, in the Government's view, law enforcement was reasonable in concluding that Zavala had no remaining interest in the broken and acid-covered battery.  (*Id.* at 10–11.)

The Government argues that, under the Fourth Amendment balancing test, the governmental intrusion of Zavala's possessory interest was minimal.  (*Id.* at 11.)  Aside from the twelve bricks of suspected heroin contained therein, Zavala had no interest in a car battery that was inoperable and covered in battery acid.  (*Id.* at 11–12.)

Zavala's invocation of *Place* as a factual analog is inapposite.  In *Place*, the Supreme Court found that the 90-minute detention alone was "sufficient to render the seizure unreasonable."  *Id.* at 710.  It further found that this violation "was exacerbated by the failure of the agents to accurately inform respondent of the place to which they were transporting his luggage."  *Id.*

In the present instance, unlike in *Place*, law enforcement's initial search of the battery was pursuant to a search warrant supported by a sworn affidavit.  (Doc. 85-4.)  That lawful search rendered the battery inoperable.  Law enforcement took these actions in the context of investigating a suspected drug trafficker.  The Government has a strong interest in rooting out drug trafficking and vigorously prosecuting it.  In conducting this investigation pursuant to a search warrant, law enforcement was reasonable in removing and probing the battery.  Once the battery

was rendered inoperable due to the probe, although the battery may have still had value in Zavala's subjective estimation, it was entirely without value from an objective and reasonable perspective.

From an objective standard, Zavala's possessory interest was unlike the property interest in *Place*.  In *Place*, there was an obvious and ongoing possessory interest in the luggage seized and the items contained therein.  By contrast, once Zavala's battery was rendered inoperable and covered in battery acid, Zavala's remaining possessory interest, if any, was minimal.

In coming to this conclusion, the court does not suggest that any possessory interest in any item ends once it is damaged or destroyed.  But in this particular instance, based on the evidence presented, the court does not perceive any possessory interest that Zavala had in the destroyed battery that was leaking battery acid save the contraband contained therein.  Because law enforcement had no way of knowing about the contraband, they could not know that Zavala had a possessory interest in the acid-covered battery.  For purposes of balancing the interests, the court finds that Zavala's possessory interest was non-existent or minimal.

The governmental interests in the destroyed battery are likewise atypical in this case.  Neither party has presented precedent showing that the Government has an environmental interest in the proper destruction of a car battery.  Nor have they

presented cases in which proper disposal of hazardous materials were the basis for a court finding a seizure constitutional.  But the court does find that the governmental interest in proper disposal of hazardous materials is a factor in this case.  The Government points out that, according to the Tennessee Department of Environmental Conservation, many types of batteries cannot be disposed of in regular trash or recycling.  (Doc. 110, p. 11 n.5 (citing Recycling Batteries, Tenn. Dep't of Env't & Conservation, https://www.tn.gov/environment/program-areas/solidwaste/materials-management-program/bopae/batteries/recyclingbatteries (last updated Sept. 27, 2023 at 1:28 PM))).  Lead acid batteries, which can be recycled at nearly all automotive stores, explode if improperly disposed of. Recycling Batteries, Tenn. Dep't of Env't & Conservation.

In this particular and peculiar circumstance, the actions of law enforcement were reasonable.  Perhaps a more expeditious investigative team might have determined more quickly how to properly dispose of the battery and followed through more directly.  But, in light of their uncertainty of how to properly dispose of the destroyed battery, law enforcement acted reasonably by containing the battery to prevent the spread of its leaking acid and holding off on disposing of it until they had determined the proper disposal method.  This interest in proper disposal of hazardous materials is not outweighed by Zavala's non-existent or minimal possessory interest in a destroyed battery.

Law enforcement's destruction of the battery as part of the search was not unnecessary or excessive.  Nor was its retention of the battery for proper disposal after rendering it inoperable.  Because Zavala's possessory interest in the battery did not outweigh the governmental interest in proper disposal of the battery, law enforcement did not violate the Fourth Amendment by retaining the inoperable battery.

### C. Due Process

Zavala likewise argues that law enforcement violated his due process right by indefinitely retaining his property, thus effecting a de facto forfeiture.  (Doc. 85, pp. 10–11.)  Zavala argues that, under Third Circuit precedent, "the government may retain seized property for a reasonable time before instituting criminal proceedings," but that retention must be "reasonably related to the government's interests in the property."  *United States v. Premises Known as 608 Taylor Ave., Apartment 302, Pitt., Pa.*, 584 F.2d 1297, 1299 (3d Cir. 1978).

In *Premises Known*, on February 1, 1977, Federal Bureau of Investigation agents searched the home of Harold Margolis pursuant to a warrant and seized $11,975 in United States currency.  *Id.*  On April 20, 1977, Margolis filed a motion to return the currency.  *Id.*  As of the Third Circuit's September 1978 opinion, no criminal proceedings had been brought against Margolis nor had any forfeiture

proceedings been brought against the property. *Id.* Margolis argued that the retention of his property violated his right to due process. *Id.*

The Third Circuit held that, when determining whether the government is reasonable in retaining property, a district court "should carefully balance the citizen's interest in use of his property against the wide-ranging governmental interests in law enforcement." *Id.* at 1303. In doing so, the court should consider "the purposes for which the property is being held." *Id.* at 1304. The court should take into account the complex and varied governmental interests including but not limited to retaining evidence for trial. *Id.*

As described in earlier sections, both Zavala and law enforcement had atypical interests in the inoperable battery covered in acid. To be sure, the battery was incapable of serving its main purpose. Law enforcement reasonably believed it was only a container of hazardous material when they retained it. And Agent Wilson credibly testified that they only retained the battery for the purpose of proper disposal.

The court finds that law enforcement's retention of the battery, until the contraband was discovered on November 9, 2021, was not unreasonable or a violation of Zavala's due process rights. It was not as extended as the months-long retention of property in *Premises Known*, and Zavala did not have an interest in the destroyed battery anywhere approaching that of Margolis' interest in his cash.

Zavala's objective interest in a destroyed and battery-acid covered battery was little if anything.  Law enforcement's interest in proper disposal of the battery was valid, and that was enough to render their retention of the battery reasonable in these circumstances with respect to due process.

### D. Exclusionary rule

To deter constitutional violations, the exclusionary rule requires that evidence derived from such violations may not be used at trial—this is the "fruit of the poisonous tree" doctrine.  *United States v. Pelullo*, 173 F.3d 131, 136 (3d Cir. 1999) (citations omitted).  This rule is "designed to eliminate any incentive for officers to violate suspects' Fourth Amendment rights."  *United States v. Caesar*, 2 F.4th 160, 169 (3d Cir. 2021).  It does so by "prohibiting the admission of illegally seized evidence at trial."  *Id.*

But the rule does not bar all illegally obtained evidence.  Instead, "[i]f . . . the exclusionary rule does not result in appreciable deterrence, then, clearly, its use in the instant situation is unwarranted."  *United States v. Leon*, 468 U.S. 897, 909 (1984).  Because the purpose of this doctrine is deterrence, that purpose would not be served by excluding evidence that is derived "when law enforcement officers have acted in objective good faith."  *See id.* at 907–08.  In these instances of good faith, or where the transgressions of law enforcement "have been minor, the magnitude of the benefit conferred on such guilty defendants" by excluding

evidence of culpability "offends basic concepts of the criminal justice system." *Id.* at 908.

In this case, the court has found that, by retaining his car battery without providing him notice, law enforcement deprived Zavala of the ability to revoke his consent. By doing so, law enforcement violated Zavala's Fourth Amendment rights. The evidence obtained as a result of this unconstitutional conduct will be excluded unless the good faith exception applies.

The Government argues that the facts show the many steps that law enforcement took to act in good faith: pursuing multiple search warrants, obtaining Zavala's written consent in Spanish, and consulting with an Assistant United States Attorney to determine whether the ultimate search of the battery was within the scope of Zavala's consent. (Doc. 110, p. 12.)

In recent decades, the "reach of the good faith exception" has expanded while the "scope of the exclusionary rule" has narrowed. *Caesar*, 2 F.4th at 169 (citation omitted). The "exclusionary rule applies only where the official conduct is sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. To trigger the exclusionary rule, law enforcement conduct must be deliberate, reckless, or grossly negligent, or involve recurring or systemic negligence." *Id.* (internal quotation marks omitted) (quoting *Herring v. United States*, 555 U.S.

135, 143–44 (2009)).  By contrast, "simple, isolated negligence . . . does not

warrant suppression."  *Id.* (internal quotation marks omitted) (quoting *Davis v.*

*United States*, 564 U.S. 229, 238 (2011)).  To assess whether the exclusionary rule

applies, a court "must determine whether—on these particular facts—the agents

acted with a good faith belief in the lawfulness of their conduct that was

'objectively reasonable.'"  *United States v. Katzin*, 769 F.3d 163, 182 (quoting

*Davis*, 564 U.S. at 237–39).

Zavala argues that this court should look to the Third Circuit opinion in

*United States v. Vasquez-Algarin*, 821 F.3d 467 (3d Cir. 2016), in which the court

noted that it was "compelled to enforce the exclusionary rule where law

enforcement officers, at the time they acted, would have or should have known

their conduct was unconstitutional."  821 F.3d at 484 (cleaned up) (quoting *Katzin*,

769 F.3d at 179).  Zavala argues that the present instance is like *Vasquez-Algarin*,

in which officers possessing an arrest warrant forcibly entered a private residence.

*Id.* at 480–81.  In that case, the officers lacked probable cause to believe that the

arrestee either resided at or was present in the residence.  *Id.*  At trial, one of the

officers testified that, at the time of their forced entry, he had concerns about

whether the premises was a third-party residence.  *Id.* at 483.  Zavala argues that,

as in *Vasquez-Algarin*, law enforcement should have known it was unlawful to

permanently retain his property without his knowledge and to then search it

without a warrant.  The requirement for a warrant, he argues, is one of the bedrock principles of Fourth Amendment jurisprudence.  (Doc. 112, p. 12.)

Zavala points out that, at the time that law enforcement destroyed the battery and found the contraband, it was under their exclusive control inside a secured and gated facility.  (*Id.* at 13.)  And law enforcement's prior search warrants were approved promptly.  (*Id.*)  No exigency required law enforcement to act without a warrant.  Zavala also argues that law enforcement retained the battery without his consent or knowledge and without informing the court.  (*Id.*)  He further argues that Agent DeBoer's conference with Agent Wilson about whether a warrant was required shows that Agent DeBoer thought one might be necessary.  (*Id.*)  Given the "legally dubious nature" of law enforcement's continued possession of the battery, he argues that any reasonable officer would have sought a search warrant. (*Id.*)

Zavala is correct insofar as there was no exigency when law enforcement destroyed the battery and found the contraband.  The battery was in law enforcement's sole possession inside a secure facility.  And their past search warrants were approved expeditiously.  And, as this court concluded above in this opinion, law enforcement's retention of the battery was not justified by consent— law enforcement did not notify Zavala that it retained the battery, so Zavala was unable to revoke his consent.  But under the totality of the circumstances, the court

24

does not conclude that law enforcement acted with gross negligence, recklessness, or deliberate disregard for Zavala's Fourth Amendment rights when they concluded that his consent allowed them to retain and subsequently search the battery.

There is ample evidence to suggest that law enforcement conducted this investigation in good faith. They obtained two search warrants for their searches. Even after obtaining the first search warrant, they obtained Zavala's written consent to bootstrap the legality of their search in light of the invasive techniques they planned to employ. Agents Wilson and DeBoer credibly testified about their efforts in this case to follow appropriate procedures.

Then, when they realized that the battery probably contained contraband, the agents conferred to determine whether Zavala's written consent was sufficient for them to search the battery. They conferred not only amongst themselves but also with a federal prosecutor. While this court has concluded that Zavala's consent did not authorize the search because the Government has not shown that Zavala was notified of the battery retention, that does not mean that law enforcement was grossly negligent or worse in coming to a different conclusion. The issue is a close case and dissimilar to the facts in *Vasquez-Algarin*.

When writing the return of the second search warrant, Agent DeBoer noted his retention of the battery. Based on his testimony, the court concludes that he did

so in an effort to properly document the retention and provide notice to Zavala. Although Agent DeBoer could not testify with certainty that Zavala was provided with notice of the battery retention when the vehicle was returned to him, the court does not find that Agent DeBoer or his fellow agents were grossly negligent in their failure to notify Zavala. Moreover, at the time when law enforcement returned the vehicle to Zavala, their only reason for retaining the battery was to properly dispose of it. There was no intention to search the battery further at that point in time. This underscores the fact that there was no improper purpose in law enforcement failing to give Zavala notice of the retained battery.

Agent DeBoer also credibly testified that, had it been necessary, he was prepared to file a third affidavit in support of a search warrant. Agent Wilson conferred with the Assistant United States Attorney to determine whether Zavala's written consent was sufficient to allow them to further search the battery. Agent Wilson credibly testified that they made the decision to dismantle the inoperable battery without a third search warrant because they thought it was allowable pursuant to Zavala's written consent.

The court is convinced that law enforcement acted in good faith to ensure that their conduct was legal in retaining and subsequently searching the battery. The court does not find that excluding this evidence would have a meaningful deterrent effect because law enforcement's conduct was not sufficiently deliberate.

Nor does the court find that law enforcement's conduct was sufficiently culpable that, if this court were to suppress the evidence, whatever negligible deterrence would be worth the price paid by the justice system. The court does not find that law enforcement acted with deliberate, reckless, or grossly negligent disregard for Zavala's Fourth Amendment rights. For these reasons, the court will not apply the exclusionary rule despite the violation of Zavala's Fourth Amendment rights.

## CONCLUSION

For the reasons explained above, the court finds that law enforcement's ultimate search of Zavala's car battery violated his Fourth Amendment rights. But because law enforcement acted in good faith, the court will not suppress the evidence found as a result of this violation. The court will deny Zavala's motion to suppress the evidence. (Doc. 84.) An appropriate order will follow.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: February 27, 2024