**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:22-CR-00237-6 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CANDELARIO ZAVALA | : | Judge Jennifer P. Wilson |

**<u>MEMORANDUM</u>**

Following a four-day trial, a jury found Candelario Zavala ("Zavala") guilty of conspiracy to distribute or possesses with intent to distribute a controlled substance in violation of 21 U.S.C. § 846. Zavala now moves for a new trial pursuant to Federal Rule of Criminal Procedure 33(a). The basis for Zavala's motion is the Government's dilatory fulfillment of its disclosure obligations under Federal Rule of Criminal Procedure 16 and *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. The Government's delayed compliance with its discovery obligations in this case is far from an exemplar of prosecutorial conduct. Nevertheless, Zavala has failed to establish that he was prejudiced by the Government's delayed disclosures. Therefore, a new trial is unwarranted, and the court will deny Zavala's motion.

BACKGROUND

## A. Zavala's Criminal Conduct

### 1. Tennessee Investigation

In 2020, the U.S. Department of Homeland Security and other law enforcement agencies were investigating narcotics trafficking in Eastern Tennessee.  (Trial Tr. 230:20–25.)  A focus of the investigation was identifying dealers in that area as well as the source from which they were obtaining controlled substances.  (Trial Tr. 231:11–20.)  Law enforcement eventually identified the source as individuals from Reading, Pennsylvania.  (Trial Tr. 237:5–9.)  Based on telephone records, law enforcement identified these individuals as Nicanor Zavala-Zavala ("Nicanor") and Alejandro Guzman-Palomares.  (Trial Tr. 240:20–241:14.)  Further investigation identified several Pennsylvania-plated vehicles associated with the drug trafficking organization.  (Trial Tr. 242:10–11.)

On November 3, 2021, one of those Pennsylvania-plated vehicles was spotted by a license plate reading system in Lenoir City, Tennessee.  (Trial Tr. 242:12–16.)  The vehicle was a Chevrolet Equinox.  (Trial Tr. 243:3–5.)  Law enforcement's interest in the Equinox was especially piqued at that time, because officials had learned a couple of days prior that the Equinox had entered the United States from Mexico.  (Trial Tr. 245:20–22.)  Upon learning that the Equinox was in

2

Lenoir City, law enforcement rushed to interdict the vehicle to search it for controlled substances. (Trial Tr. 242:19–21; 246:8–10.)

That same day, Lieutenant Bryan Martin ("Lieutenant Martin") of the Tennessee Highway Patrol effectuated a traffic stop of the Equinox for a taillight violation. (Trial Tr. 166:13–167:14; 170:10-11.) Zavala was driving the Equinox at the time. (Trial Tr. 167:13–19.) Zavala appeared to be more nervous than the ordinary person at a traffic stop as he told Lieutenant Martin that he was traveling from Mexico and failed to produce a driver's license. (Trial Tr. 169:8–24.) Lieutenant Martin then asked Zavala to accompany him to his police vehicle in order to further investigate whether Zavala had a license. (Trial Tr. 170:8–12.) While standing next to the police vehicle, Zavala still appeared unusually nervous, especially when Lieutenant Martin asked him if he had anything illegal in his car. (Trial Tr. 171:7–19.) Zavala attempted to redirect Lieutenant Martin's questions quickly when he began asking about contraband. (Trial Tr. 179:25–180:4). Due to his suspicions, Lieutenant Martin asked Zavala if he could search the Equinox. (Trial Tr. 180:4–7.) Zavala consented. (Trial Tr. 170:22–171:6.)

Lieutenant Martin utilized a K-9 unit to conduct a preliminary search of the vehicle. (Trial Tr. 171:23–24.) The K-9 alerted to the vehicle's driver's side door. (Trial Tr. 172:2–4.) Law enforcement then performed a "cursory search" of the Equinox, which involved searching various parts of the vehicle—such as the

passenger compartment, battery trays, air hoses, and vacuum hoses—without dismantling them. (Trial Tr. 172:10–24.) Although the cursory search yielded no controlled substances, Lieutenant Martin retrieved a car battery from the Equinox's back floorboard that had tool markings on top. (Trial Tr. 172:25–173:17.) Based on his training, Lieutenant Martin suspected that this battery might be hiding drugs. (Trial Tr. 173:18–19.) Law enforcement eventually arrested Zavala. (Trial Tr. 174:15–17.)

Law enforcement then impounded the Equinox in a Lenoir City Police Department garage and sought a state search warrant. (Trial Tr. 246:18–25.) Once obtained, law enforcement executed the search warrant. (Trial Tr. 247:1–3.) This more thorough search still yielded no controlled substances. (Trial Tr. 247:11–13.) Law enforcement did, however, find money transfer receipts in the Equinox, specifically one indicating Zavala as a recipient and another indicating Nicanor as a recipient. (Trial Tr. 251:8–252:3.) Both transfers were dated October 28, 2021, and in the amount of about $360 or $380. (Trial Tr. 251:1–3; 251:17–18; 250:19–21.)

The next day, on November 4, 2021, law enforcement interviewed Zavala, who appeared willing to cooperate. (Trial Tr. 285:1–16.) During the interview, Zavala explained his recent travels to Mexico. He stated that he had been making more frequent trips to Mexico to visit family, especially his aging parents. (Trial

4

Tr. 287:1–12.)  He further stated that he had traveled to Mexico earlier in 2021 for the death of his mother and in November 2021 for the death of his father.  (Trial Tr. 287:13–18.)  Zavala also reported that Nicanor had become increasingly insistent that Zavala accompany him on trips to Mexico.  (Trial Tr. 287:24–288:2.) Zavala told law enforcement that he was coming to the realization that perhaps Nicanor and others were using him to transport drugs.  (Trial Tr. 288:3–8; 289:19–21.)  Nevertheless, Zavala disclaimed any knowledge of narcotics in the Equinox. When asked if there were drugs in his vehicle, he stated, "not that I know of." (Trial Tr. 290:5–9.)

A couple days after the events of November 3 and 4, a confidential source informed law enforcement that Nicanor had arrived in Eastern Tennessee.  (Trial Tr. 255:2–4.)  The confidential informant then had a face-to-face meeting with Nicanor in Lenoir City, during which the confidential informant wore audio and video recording equipment.  (Trial Tr. 255:8–11.)  During the meeting, Nicanor made multiple references to a battery and appeared to be looking for the one found in Zavala's Equinox.  (Trial Tr. 255:12–256:8.)  Nicanor's comments convinced law enforcement to search the battery, which was still in police custody.  (Trial Tr. 256:2–14.)  The search of the battery occurred on November 9, 2021.  (Trial Tr. 346:15–22.)  After attempts to pry open the battery failed, law enforcement smashed the battery with a sledgehammer.  (Trial Tr. 347:20–348:2.)   Inside it

were twelve bricks of heroin.  (Trial Tr. 348:3–16.)  The bricks collectively

contained 3,941 grams of heroin.  (Trial Tr. 728:18–729:3.)

On December 8, 2021, law enforcement again interviewed Zavala in

Tennessee, hoping that he would cooperate when confronted with the newly

discovered evidence.  (Trial Tr. 259:18–260:13.)  This time, Zavala provided law

enforcement much more information about his involvement in the drug trafficking

operation.  He permitted law enforcement to search his cell phone and the

messages on his "WhatsApp" messaging application.  (Trial Tr. 260:11–13.)  Some

of these messages were between Zavala and a Mexican phone number that Zavala

identified as belonging to an individual known as Pancho.  (Trial Tr. 266:24–

267:15; 309:15–310:4.)  During the interview, Zavala explained his relationship to

Pancho.  He told law enforcement that Pancho approached him in Mexico in 2020

about transporting a battery from Mexico to Reading.  (Trial Tr. 291:6–21.)

Zavala reported that he initially refused Pancho's request, but then later conceded

to help Pancho when he threatened Zavala's family.  (Trial Tr. 292:22–294:6.)

Zavala then explained to law enforcement that he had transported batteries from

Mexico to Reading on four occasions and was paid about $2,000 per trip.  (Trial

Tr. 318:14–23; 319:3–8.)  Zavala also provided law enforcement with other

information about the trafficking scheme, including Pancho's practice of shipping

packages filled with narcotics to a specific street address in Reading and the

identity of Nicanor's mechanic.  (Trial Tr. 310:14–22; 319:16–320:20.)  At the end of the December 2021 interview, law enforcement decided they should enroll Zavala as a confidential informant.  (Trial Tr. 310:23–311:1.)

### 2. Pennsylvania Investigation

A related investigation into heroin and methamphetamine trafficking was occurring in Berks County and Adams County, Pennsylvania at the same time as the Tennessee investigation.  (Trial Tr. 580:8–16.)  A confidential informant in Adams County reported to police that the Berks County drug trafficking organization was run by an individual in Mexico known as Pancho.  (Trial Tr. 582:12–19.)  According to the confidential informant, Pancho worked closely with Erick Orihuela-Solalinde, his cousin in Pennsylvania, who would deliver the controlled substances to the confidential informant for resale.  (Trial Tr. 582:25–583:5.)  Law enforcement ultimately set up two controlled purchases of methamphetamine from Erick Orihuela-Solalinde, one in November 2021 and one in January 2022. (Trial Tr. 583:11–589:19; 609:15–614:13.)

On January 29, 2022, following that January 2022 controlled purchase, investigators met with Zavala in Reading.  (Trial Tr. 614:13–615:13.) Investigators' understanding was that Zavala was cooperating in the Tennessee investigation and was interested in doing the same in the Pennsylvania investigation.  (Trial Tr. 615:4–10; 616:22–24.)  Law enforcement's goal for the

meeting was to gather information on certain people involved in the drug trafficking organization. (Trial Tr. 621:3–13.) In this respect, Zavala provided law enforcement several pieces of information concerning Pancho. He confirmed that Pancho's name was Francisco Orihuela-Iglesias. (Trial Tr. 621:23–622:9.) He provided two phone numbers he believed belonged to Pancho. (Trial Tr. 622:10–12.) He provided a physical description of Pancho and positively identified Pancho using a photo provided by law enforcement. (Trial Tr. 622:22–623:4.) He stated that Pancho lived in Toluca, Mexico, just outside Mexico City. (Trial Tr. 623:5–8.)

Zavala also described additional details about his involvement in the drug trafficking organization. He stated that he had transported batteries from Mexico to Pennsylvania about five or six times. (Trial Tr. 624:11–19.) He admitted that he would drop off the batteries with Erick Orihuela-Solalinde. (Trial Tr. 627:4–9.) He clarified his payment structure: Pancho would pay him $500 upon picking up the batteries in Mexico, and Erick Orihuela-Solalinde would pay him $1,500 upon dropping off the batteries in Reading. (Trial Tr. 627:7–12.) Most incriminating, Zavala reported that Nicanor had told him at times that the batteries contained methamphetamine. (Trial Tr. 628:15–21.)

Law enforcement in Pennsylvania again conducted an interview of Zavala in February 2022.  The Government never elicited testimony about this interview at trial.  Nothing in the record reveals what Zavala said during this interview.

### 3.  Indictment

On June 6, 2022, Zavala and other members of the drug trafficking organization were indicted.  (Doc. 1.)  The indictment charged Zavala with one count of conspiracy to distribute and possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 846.  (*Id.* at 1–2.)[1]  Zavala pleaded not guilty and proceeded towards trial.  (Doc. 30.)

### B. Government's Disclosures Before and During Trial

The Government's disclosures of three categories of documents are central to Zavala's motion for a new trial.  The first category is Zavala's own statements to law enforcement during the November 2021, December 2021, January 2022, and February 2022 interviews.  The second is the Government's Rule 16(a)(1)(G) expert disclosure.  The third is the files that the Government kept with respect to Ricky Lee Crespo ("Crespo") and Erika Sluzevich ("Sluzevich"), two confidential informants who participated in a controlled buy from Nicanor.  Each category will be discussed separately.

---

[1] For ease of reference, the court uses the page numbers from the CM/ECF header.

### 1. Zavala's Statements to Law Enforcement

Zavala's counsel made several requests to the Government for production of Zavala's statements to law enforcement.  On July 1, 2022, defense counsel sent a Notice of Discovery Requests that sought, *inter alia*, disclosure of "[a]ny oral, written, or recorded statements attributed to Mr. Zavala, whether before or after arrest, including in response to any interrogation or questioning and testimony at a grand jury."  (Doc. 262-1, p. 1.)  Defense counsel made a similar request on October 13, 2022, and a specific request on March 27, 2024, for recordings of the November 2021 and December 2021 interviews.  (Docs. 262-2, p. 2; 262-3, p. 2.)  The Government produced recordings of Zavala's November 2021 interview at some point following defense counsel's March 27, 2024, request.  The Government did not produce recordings of the December 2021 interview until later, sometime between October 1 and 24, 2024.  (See Docs. 262, p. 5; 262-4, p. 1.)

On October 24, 2024, defense counsel sought clarification from the Government on whether further communications between Zavala and law enforcement took place after the December 2021 interview.  (Doc. 262-4, p. 1.)  That same day, defense counsel learned of the January 2022 interview.  (Trial Tr. 595:18–21.)  The Government did not provide defense counsel a report of that interview until October 29, 2024.  (Trial Tr. 595:16–24.)  At some time thereafter,

but before the beginning of trial, the Government produced handwritten notes of the January 2022 interview that conflicted with the report.  (Trial Tr. 595:21–24.)  At trial, defense counsel stated that she was prepared to examine witnesses about the January 2021 interview, but asked that evidence of the interview be excluded as a sanction for the Government's delayed compliance with Rule 16.  (Trial Tr. 599:10–16.)  The court denied the request, finding that the belated disclosure did not sufficiently prejudice Zavala to warrant exclusion.  (Trial Tr. 605:12–19.)

The Government did not apprise defense counsel of the existence of the February 2022 interview until the morning Zavala's trial began, November 12, 2024.  (Trial Tr. 595:23–596:8.)  At that time, the Government produced a photocopy of notes taken during the February 2022 interview.  (Trial Tr. 596:8–13.)  The Government confirmed at trial that these notes were the only document the Government possessed with respect to the February 2022 interview.  (Trial Tr. 601:23–602:4.)  The Government decided not to introduce evidence at trial concerning the February 2022 interview.

### 2. Government's Expert Disclosure

In her initial discovery requests, defense counsel also requested "[t]he circumstances . . . of any . . . expert opinions."  (Doc. 262-1, p. 1.)  Not until October 30, 2024, did the Government produce an expert disclosure to defense counsel in accordance with Federal Rule of Criminal Procedure 16(a)(1)(G).  (Trial

Tr. 668:23–669:3; Doc. 262-7.)  The Government disclosed Pennsylvania State Police Trooper Shawn Wolfe ("Trooper Wolfe") as an expert on heroin and methamphetamine trafficking.  (Doc. 262-7, pp. 4–5.)  The disclosure also provided a list of ten cases in which Trooper Wolfe testified during the previous four years.  (*Id.* at 6.)  However, the Government did not include the corresponding docket numbers with those cases.  (*Id.*)

At trial, defense counsel stated that she was unable to obtain transcripts of Trooper Wolfe's testimony in three of the cases listed in the Government's disclosure.  (Trial Tr.  675:10–20.)[2]  Defense counsel attributed this failure to the Government's omission of docket numbers in its expert disclosure as well as the lateness of its disclosure.  (Trial Tr. 671:6–10.)  Defense counsel argued that the inability to obtain the transcripts hindered her ability to prepare adequately for Trooper Wolfe's cross-examination.  (*Id.*; Trial Tr. 673:10–16.)  Defense counsel, thus, objected to Trooper Wolfe being permitted to testify as an expert.  (Trial Tr. 667:6–10.)

In response, the court made three rulings.  First, the court found that the Government's omission of docket numbers in its expert disclosure did not contravene the plain language of Rule 16, which required the Government to

---

[2] Defense counsel had obtained six of the ten transcripts, but stated that the parties believed one of the four outstanding transcripts involved grand jury testimony.  (Trial Tr. 671:19–24.)

provide "a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition."  (Fed. R. Crim. P. 16(a)(1)(G)(iii); Trial Tr. 678:1–4.)

Second, the court determined that the Government's disclosure was not untimely, because the court had not set a disclosure deadline as required by Rule 16(a)(1)(G)(ii).  (Trial Tr. 678:17–25.)  The court observed that the operative criminal practice and scheduling order did not set an expert disclosure deadline. (*See* Doc. 38.)  The court entered that order on June 24, 2022, which was before Rule 16(a)(1)(G) was revised to include the deadline-setting mandate in subparagraph (ii).  *Compare* Fed. R. Crim. P. 16 (eff. Dec. 1, 2013), *with* Fed. R. Crim P. 16 (eff. Dec. 1, 2022).  The court acknowledged that not setting such a deadline was its own error.  (Trial Tr. 678:17–21.)

Finally, the court ruled that defense counsel's inability to obtain the three transcripts did not sufficiently prejudice Zavala so as to warrant exclusion of Trooper Wolfe's expert testimony.  (Trial Tr. 679:1–11.)  Based on these three rulings, the court did not exclude Trooper Wolfe's expert testimony.

### 3.  Crespo's and Sluzevich's Confidential-Informant Files

The Government was also slow to disclose information about witnesses Crespo and Sluzevich.  These individuals were the targets of two controlled buys

and later assisted law enforcement as confidential informants in a controlled buy targeting Nicanor.  (Trial Tr. 355:8–18; 359:21–360:7; 362:1–14.)

Defense counsel first learned that the Government would potentially call Sluzevich and Crespo as witnesses when the Government filed its witness list one week before trial.  (*See* Trial Tr. 328:17–20; Doc. 202.)  Upon reviewing the Government's witness list, defense counsel requested from government counsel, *inter alia*,  Crespo's and Sluzevich's "criminal histories and details of their cooperation agreements and complete details regarding any favorable consideration either has received."  (Doc. 262-6, p. 1.)  Defense counsel had previously requested information on favorable consideration provided to any person in her original July 2022 discovery request.  (Doc. 262-1, p. 2.)  The Government responded with Crespo's and Sluzevich's criminal records and a representation that Crespo had been paid $2,800 and Sluzevich a smaller sum for their work as confidential informants.  (Trial Tr. 328:23–24; 329:20–25; 411:22–24.)

Two events at trial revealed that the Government's disclosures were lacking.  First, on the morning of the second day of trial—the day the Government initially planned to call Crespo to testify—government counsel informed defense counsel that Crespo had a pending felony charge for receiving stolen property, which was not included in its previously disclosed criminal history.  (Trial Tr. 328:17–331:23;

14

335:2–4.)  When defense counsel raised this issue with the court, government counsel had not produced any additional documentation regarding these charges. (*See* Trial Tr. 338:16–22.)  The court instructed the Government to refrain from calling Crespo until the Government provided documentation to defense counsel concerning the offense—such as the criminal complaint, information, and memorializations of plea discussions.  (Trial Tr. 339:7–10.)  The Government ultimately never called Crespo to the stand.

The second event came during the testimony of Pennsylvania Office of Attorney General Agent James Hinton, Jr. ("Agent Hinton").  Agent Hinton was Crespo's and Sluzevich's "handler."  Defense counsel informed the court prior to Agent Hinton's testimony that government counsel had not provided her any financial records confirming the purported payments to Crespo or Sluzevich. (Trial Tr. 329:20–330:1.)  Government counsel, in response, stated that it could get such information to defense counsel that afternoon.  (Trial Tr. 338:11–15.)  This missing information also contributed to the court instructing the Government to refrain temporarily from calling Crespo to the stand.  (Trial Tr. 339:7–10.) Nevertheless, the Government was permitted to call Agent Hinton.

During cross-examination, defense counsel questioned Agent Hinton about the payments made to Crespo and Sluzevich.  Agent Hinton stated, unexpectedly to defense counsel, that the payments were simply reimbursements for gas and phone

minutes.  (Trial Tr. 404:15–22.)  At sidebar, defense counsel moved for a mistrial on the basis that government counsel intentionally withheld information concerning the payments.  (Trial Tr. 405:2–7; 411:14–17.)  Government counsel denied any intentional misconduct.  (Trial Tr. 411:19–21.)  The court then recessed trial for the day before resuming Agent Hinton's cross-examination in order to give government counsel time to produce and defense counsel time to review the files concerning the payments.  (Trial Tr. 430:20–431:11.)  The court also informed the parties that it would review any legal authorities they wished to submit concerning defense counsel's oral motion for a mistrial.  (Trial Tr. 434:12–435:5.)  The court received counsel's authority that evening.

The next morning, the court confirmed that government counsel had produced the files to defense counsel and that defense counsel had adequate time to prepare for the remainder of Agent Hinton's cross-examination.  (Trial Tr. 440:19–22; 443:1–6.)  The court ruled that the Government's production plus defense counsel having adequate time to review the material cured any *Brady*/*Giglio* violations that had occurred.  (Trial Tr. 443:8–11.)  The court relied primarily on the reasoning of *United States v. Claxton*, 766 F.3d 280 (3d Cir. 2014), and *United States v. Johnson*, 816 F.2d 918 (3d Cir. 1987).  (Trial Tr. 440:24–441:12.)  Thereafter, defense counsel effectively cross-examined Agent Hinton with the materials produced by the Government.  (Trial Tr. 487:12–507:12.)

16

### C. Verdict and Post-trial Motions

On November 15, 2024, the trial concluded with the jury finding Zavala guilty of conspiracy to distribute or possess with intent to distribute a controlled substance. (Doc. 226, p. 1.) The jury also found that 50 grams or more of methamphetamine and 1,000 grams or more of heroin were within the scope of the conspiracy, thus triggering a mandatory minimum sentence pursuant to 21 U.S.C. § 841(b)(1)(A)(i), (viii). (*Id.* at 3.)

On March 14, 2025, Zavala timely filed a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33(a) along with a brief in support. (Docs. 261 & 262.) The Government filed a timely brief in opposition. (Doc. 276.) Zavala did not file a reply brief. Zavala's motion is now ripe for adjudication.

### STANDARD OF REVIEW

Federal Rule of Criminal Procedure 33 states, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The decision to grant or deny" such a motion "is committed to the sound discretion of the District Court." *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006). Rule 33 motions "are not favored and should be 'granted sparingly and only in exceptional cases.'" *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008) (quoting *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)). Such an

exceptional case presents when errors at trial "either individually or in combination, 'so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'"  *United States v. Amirnazmi*, 648 F. Supp. 2d 718, 719–20 (E.D. Pa. 2009) (quoting *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993)).  It is a defendant's burden to prove that a new trial is warranted.  *Id.* at 719.

## DISCUSSION

### A. Violations of Federal Rule of Criminal Procedure 16

Zavala first contends that a new trial is required because of the Government's Rule 16 violations.  The argument is premised on two purported violations of Rule 16.  The first being the Government's belated disclosure of Zavala's statements to law enforcement during his four interviews in violation of Rule 16(a)(1)(A).  The second being deficiencies in the Government's expert disclosure that violated Rule 16(a)(1)(G).  Assuming, *arguendo*, that these are violations of Rule 16, Zavala must show he was prejudiced to warrant a new trial.

A violation of Rule 16 will justify a new trial only when the defendant has shown that such violation prejudiced him.  *United States v. Millhouse*, 346 F. App'x 868, 871 (3d Cir. 2009).  This requires showing "a likelihood that the verdict would have been different had the government complied with the discovery rules."  *Id.* (quoting *United States v. Davis*, 397 F.3d 173, 178 (3d Cir. 2005));

*accord United States v. Elmore*, 548 F. App'x 832, 835 (3d Cir. 2013). A discovery violation may justify a new trial when it "interfer[ed] with the defendant's ability to prepare for trial and develop an intelligent defense strategy." *United States v. Lee*, 573 F.3d 155, 164 (3d Cir. 2009).

However, courts presume that delayed receipt of discovery does not prejudice a defendant when counsel thereafter does not request a continuance. *United States v. Ivy*, 83 F.3d 1266, 1281 (10th Cir. 1996); *United States v. Sepulveda*, 15 F.3d 1161, 1178 (1st Cir. 1993); *United States v. Douglas*, 862 F. Supp. 521, 526 (D.D.C. 1994), *aff'd*, 70 F.3d 638 (D.C. Cir. 1995); *cf. De Laval Turbine, Inc. v. W. India Indus., Inc.*, 502 F.2d 259, 263 n.6 (3d Cir. 1974) ("Any claim of prejudice (surprise) is belied by the fact that [defense] counsel did not request a continuance . . . .")

Based on these principles, Zavala has not convinced the court that either purported Rule 16 violation caused him prejudice. The court explains each in turn.

### 1. Zavala's Statements

Zavala argues that the Government's delayed production of his own statements prejudiced him in three ways. First, his counsel was unable to explain all of the evidence against him before trial. (Doc. 262, p. 15.) Second, his counsel could not explain the impact of this evidence on his defense strategy. (*Id.* at 15–

19

16.)  Finally, the belated disclosure precluded his defense team from independently investigating the substance of Zavala's statements.  (*Id.* at 16.)

Zavala's arguments are unavailing.  He does not mention at all how the outcome of the case could have been different if the Government timely disclosed his own statements to him.  Defense counsel's inability to discuss the evidence with Zavala or explain it to him is not a verdict-influencing prejudice.  Counsel being unable to investigate their client's statements theoretically could be verdict-influencing, but Zavala has failed to explain how it is here.  Zavala makes no attempt to demonstrate what information such an investigation would have, or even could have, revealed nor how that information could have influenced his trial strategy or presentation.  On this record, it would be mere speculation to conclude that any additional investigation would have had a likelihood of changing the outcome of this trial.

Moreover, Zavala's assertion of prejudice rings hollow in light of defense counsel's decision not to seek a continuance.  In fact, defense counsel affirmatively stated that she was prepared for cross-examination with respect to the latter-produced January 2022 and February 2022 statements.  (Trial Tr. 599:10–16.)  Defense counsel certainly proved herself ready.  She effectively cross-examined government witnesses about Zavala's December 2021 and January 2022 interviews

such that the jury found Zavala had withdrawn from the conspiracy on the date of the December 2021 interview.  (Doc. 226, p. 2).

Given these circumstances, the court concludes that the Government's late disclosure did not affect the outcome of Zavala's trial.  *See United States v. Tagliamonte*, 340 F. App'x 73, 81 (3d Cir. 2009) (finding no new trial was warranted for a violation of Rule 16(a)(1)(A) when the defendant failed (1) to show that the Government's "untimely disclosure required modification of his trial strategy or otherwise impaired the presentation of a complete defense" and (2) never sought a continuance.)  Accordingly, the court will not order a new trial for the Government's belated satisfaction of its obligations under Rule 16(a)(1)(A).

### 2.  Government's Expert Disclosure

Zavala does not challenge the court's midtrial rulings that the Government's expert disclosure was substantively compliant with Rule 16(a)(1)(G)(iii) and not untimely.[3]  Instead, Zavala argues that the Government's disclosure violated the "spirit" of Rule 16(a)(1)(G).  (Doc. 262, p. 13.)  He claims that the timing and substance of the Government's disclosure prejudiced him in two ways.  First, the timing of the disclosure gave Zavala no opportunity to retain an expert.  (*Id.*)  Second, the omission of docket numbers from the list of cases in which Trooper

---

[3] For its part, the Government contests that its disclosure was untimely.  (Doc. 276, p. 30.)

Wolfe's testified made it impossible to obtain all the transcripts in preparation for trial. (*Id.*)

Zavala's arguments on this issue fare no better than his other Rule 16 arguments. The Government produced the expert disclosure approximately two weeks before trial. It should not have been surprising to defense counsel that the Government was planning on calling an expert witness. *See United States v. Martinez*, 476 F.3d 961, 967 (D.C. Cir. 2007) ("Expert testimony about the methods of drug organizations is common in drug cases."); *see also United States v. McGlory*, 968 F.2d 309, 345 (3d Cir. 1992) ("In cases involving narcotics trafficking, courts have admitted a broad range of expert testimony concerning the 'modus operandi' of the drug trade."). Given the unsurprising disclosure of this kind of expert testimony in this kind of criminal case, the timing of the Government's disclosure is not unreasonable *per se*. *Cf. United States v. Rhines*, 143 F. App'x 478, 482 (3d Cir. 2005) (finding no prejudice when the Government produced an expert's expected testimony and curriculum vita two weeks before trial); *United States v. Mohammed*, Crim. Action No. 06-357 (CKK), 2008 WL 5552330, at *3 (D.D.C. May 6, 2008) (finding no prejudice when the Government produced an expert disclosure in a drug trafficking case nine days before trial and the court granted a five-day continuance).

Nor is it unreasonable in this case. Zavala simply stating that he had no time to retain an expert is not enough. Zavala makes no attempt, for instance, to explain the testimony his expert could have provided, how that testimony could have rebutted Trooper Wolfe's testimony, or how in any other way the outcome of this case could have been different if he had retained an expert. Nor is there any indication that Zavala's counsel even attempted to retain an expert in advance of trial. And, again, Zavala's claim of prejudice is belied by defense counsel's decision not to request a continuance.

Similarly, Zavala makes no showing of prejudice with respect to the Government's omission of docket numbers in its disclosure. Even with the benefit of many months to obtain the three transcripts he could not obtain before trial, Zavala does not explain how having access to the contents of those transcripts could have changed the outcome of his trial. Without such a showing, the court cannot find that a new trial is warranted. Accordingly, the court will not grant a new trial on the basis of the Government's delayed compliance with Rule 16.

## B. *Brady* & *Giglio* Violations

Zavala next contends that he was prejudiced by the Government's failure to disclose exculpatory evidence in a manner consistent with his due process rights. Zavala's grievance arises from the Government's midtrial disclosure of Crespo's

pending criminal charge and the terms of the payments Crespo and Sluzevich received.  (Doc. 262, p. 15.)

The Fifth Amendment to the United States Constitution guarantees that "[n]o person shall . . . be deprived of life, liberty, or property without due process of law."  U.S. Const. amend V.  The Government violates a defendant's due process rights when it suppresses evidence favorable to the defendant that "is material to guilt or to punishment."  *Brady* 373 U.S. at 87.  So, too, "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within" *Brady's* purview. *Giglio v. United States*, 405 U.S. 150, 154 (1972).  To prove a violation of *Brady* and/or *Giglio*, a defendant must satisfy the same three-prong test.  *United States v. Georgiou*, Crim. Action No., 09-88, 2018 WL 9618008, at *28 n.33 (E.D. Pa. June 19, 2018).  A defendant must show: "(1) evidence was suppressed; (2) the evidence was favorable to the defense; and (3) the evidence was material to guilt or punishment."  *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006).  Courts must also look to whether the suppression prejudiced the defendant.  *United States v. Zayas*, 32 F.4th 211, 230 (3d Cir. 2022).  This "prejudice inquiry turns on whether the defendant received a fair trial, one resulting in a verdict of confidence."  *Id.*

Zavala's argument on this issue is somewhat narrow considering that during trial, the Government ultimately did turn over the *Brady/Giglio* evidence concerning Crespo and Sluzevich. Nevertheless, total suppression is not necessary to find a *Brady* violation. Even when exculpatory evidence is disclosed, a *Brady* violation may still result if it was not disclosed "in time for its effective use at trial." *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983). Conversely, "[w]here the government makes *Brady* evidence available during the course of a trial in such a way that a defendant is able to effectively use it, due process is not violated and *Brady* is not contravened." *Johnson*, 816 F.2d at 924.

Zavala acknowledges that his counsel eventually made use of the belatedly disclosed evidence about payment terms to cross-examine Agent Hinton. Zavala makes no argument that his counsel had no opportunity to use the evidence at all. Rather, he argues his counsel's cross-examination of Agent Hinton was rendered less effective for two reasons. The first being that his counsel was unable to impeach Agent Hinton with that evidence on the day he initially took the stand. (*See* Doc. 262, p. 16.) The second being that "the tenor of the impeachment was dulled" by the court adjourning early to allow the Government to produce the evidence. (*Id.*) The court is unconvinced that this type of prejudice, if prejudice at all, casts doubt on the fairness of Zavala's trial such that a new trial is necessary.

The Third Circuit has routinely held that due process is not infringed when defense counsel has access to and makes use of exculpatory evidence during cross-examination, notwithstanding that the evidence was disclosed during trial. *United States v. Edwards*, No. 22-3306, 2024 WL 4035909, at *2 (3d Cir. Sept. 4, 2024); *Claxton*, 766 F.3d at 304; *Johnson*, 816 F.2d at 924; *Higgs*, 713 F.2d at 44. Indeed, the *Higgs* court found that disclosure of impeachment material on the day a government witness planned to testify did not contravene the defendant's due process rights. *Higgs*, 713 F.2d at 44. At trial, the court relied on *Claxton* and *Johnson* in finding that Zavala was not prejudiced when his counsel obtained the *Brady*/*Giglio* material and had sufficient time to prepare for cross-examination. (Trial Tr. 440:23–441:12). Zavala offers no legal authority to suggest that the court erred in this respect. The facts remain that defense counsel effectively cross-examined Agent Hinton on the payments to Crespo and Sluzevich, and defense counsel never needed to impeach Crespo with his pending charge since he never took the stand. Thus, no prejudice ensued from the Government's belated disclosures. For this reason, no new trial is warranted.

## CONCLUSION

The court's rulings during trial and on this motion should not be construed as court approval of government counsel's collective conduct in producing discovery materials. Their late and incomplete disclosures were, frankly, unbecoming of representatives of the United States Attorney's Office. This is not to lay the blame at the feet of the Assistant United States Attorneys who tried this case. The Government has been represented in this case by several attorneys of record. Trial counsel, to their credit, attempted to remedy the Government's prior discovery shortcomings. Shortcomings they were, nonetheless. The court expects better from the Government. After all, prosecutors represent "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). Despite the Government's shortcomings, the court is convinced that Zavala was afforded a full and fair opportunity to present a complete defense. The court, therefore, will deny Zavala's motion for a new trial. An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: June 16, 2025

27